**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**
      **Plaintiff,**

    **v.**                                **Case No. 09-CR-65**

**THOMAS H. BUSKE**
      **Defendant.**

---

**DECISION AND ORDER**

Before me is defendant Thomas Buske's motion to dismiss and request for an evidentiary hearing. Defendant argues that the instant prosecution (1) violates his double jeopardy rights, as it follows a civil suit brought against him by the alleged victim; and (2) constitutes a "departure from the proper administration of criminal justice," United States v. Kordel, 397 U.S. 1, 13 (1970), given what he sees as improper coordination between the alleged victim and the government. For the reasons that follow, I deny the motion without a hearing.

## I. FACTS AND BACKGROUND

**A.**    **Summary of the Case**

The government charged defendant with six counts of mail fraud (counts 1-6), six counts of interstate transportation of stolen goods (counts 7-12), conspiracy to commit money laundering (count 13), seven counts of money laundering under 18 U.S.C. § 1956 (counts 14-20), and three counts of money laundering under 18 U.S.C. § 1957 (counts 21-23). The indictment alleged that defendant, the owner of an Illinois trucking firm, schemed to defraud the S.C. Johnson Company ("SCJ") by submitting fraudulent invoices for transportation

services; that an employee of SCJ, Milt Morris, approved the invoices for payment, knowing them to be false, in exchange for kick-backs; and that defendant engaged in various unlawful financial transactions with the proceeds of the fraud. Counts 1-6 pertain to payments SCJ sent defendant, counts 7-12 to the transportation of alleged kick-backs from Illinois to Wisconsin, and counts 21-23 to checks defendant wrote at a casino in Las Vegas with alleged proceeds of the fraud. The government later dismissed counts 13-20 (the § 1956 money laundering charges).

In 2004, SCJ filed a civil suit in state court against Morris, defendant and his companies, and others arising out these events, and in 2008 a jury returned a verdict in favor of SCJ in excess of $200 million. Defendant was indicted in this case in March 2009, following a lengthy grand jury investigation. Morris, charged separately, pleaded guilty and agreed to cooperate with the government. Defendant's case is set for trial on October 1, 2012.

## B. Defendant's Factual Proffer

In his motion and request for hearing, defendant alleges that the government and SCJ conducted a joint investigation and shared resources; SCJ played an active role in the prosecution, including assisting in obtaining and executing a search warrant, interviewing witnesses, and providing documents and other information; the government obtained information and/or evidence from SCJ, and the prosecutor and agents shared information with SCJ; certain strategic decisions were jointly made; and information gathered by one party was relevant and helpful to the other party.

Defendant further contends that the timing of the two cases demonstrates improper coordination. Specifically, he notes that SCJ filed its initial civil action against Morris (defendant was added to the suit later) on October 18, 2004; that same day, federal agents executed a

2

search warrant at Morris's SCJ office. SCJ lawyers were present for the search, even though the warrant had been issued under seal. The search warrant affidavit was based entirely on information provided to the government by SCJ's investigative team.

On December 9, 2004, the grand jury issued a subpoena to defendant's bank, with which the bank complied on December 20, 2004. Two days later, on December 22, 2004, SCJ filed an amended complaint in the civil lawsuit adding defendant and his companies to the suit. Defendant contends that about thirty days later, on January 21, 2005, an imposter called defendant's bank seeking account information. A customer service representative at a branch office provided some information, but the manager of the main office later verified that the real Thomas Buske did not make the call. The next day, a person pretending to be defendant called a different branch to get account information, but an alert on the account caused the call to be transferred to the main branch manager, who recognized the caller's voice as someone other than defendant. The manager indicated that he would have the bank's trust department contact "Mr. Buske," but the caller indicated that he was attending a conference in Washington, D.C. and would call back. Defendant indicates that unless they were conducted by a law enforcement officer, these pretext calls constituted a felony under 15 U.S.C. §§ 6821 and 6823.

On or about February 10, 2005, the government issued a grand jury subpoena to defendant's bank for records pertaining to a business account; on March 11, 2005, the government issued a subpoena for information pertaining to a second business account. In addition to obtaining records, the government began interviewing witnesses in November 2004, with many of the interviews conducted jointly with representatives of SCJ.

The civil trial began on January 28, 2008. Because of the pending grand jury

3

investigation, most of defendant's fact witnesses (including defendant himself) refused to testify on Fifth Amendment grounds. The jury returned a verdict in SCJ's favor, and the court entered judgment for $203.8 million, including double damages pursuant to the Wisconsin Organized Crime Control Act ("WOCCA").

Defendant indicates that according to discovery materials provided by the government, case agents conducted a total of ninety-two witness interviews; at the time of the civil trial, eighty-five of those interviews had been completed. On February 26, 2009, the deadline for filing a motion for a new trial in the civil case based on newly discovered evidence expired.[1] See Wis. Stat. § 805.16(4). In the year between the civil verdict and the new trial motion deadline, government agents conducted a total of seven witness interviews, three of the same person. Twelve days after the new trial motion deadline passed, and a little over four years after the grand jury investigation began, defendant was indicted.

Defendant indicates that following his indictment the government provided discovery, including numerous witness statements that could have been used at the civil trial had his counsel known of them. For example, the discovery included numerous interviews with Morris, during which Morris admitted taking kickbacks but denied that SCJ paid above the market rate to fund the payments.[2] Defendant also learned for the first time that Morris was cooperating with the government pursuant to a proffer letter providing him with use immunity, despite his assertion of the Fifth Amendment privilege in the civil case. The criminal discovery also

---

[1]Defendant did take a direct appeal to the Wisconsin court of appeals, but the judgment was affirmed, including the award of double damages pursuant to the WOCCA. S.C. Johnson & Sons, Inc. v. Milton E. Morris, et al., 322 Wis. 2d 766, 789 (Ct. App.), review denied, 327 Wis. 2d 461 (2010).

[2]Morris apparently later changed his story in this regard.

revealed similarly helpful statements made by another SCJ transportation department employee, Dan Long, who denied that illegal conduct by Morris cost the company any money. Long also refused to testify in the civil case on self-incrimination grounds. Defendant indicates that the jury in the civil case heard none of this, and by the time the information was released in criminal discovery the time limit for filing a motion for a new civil trial had expired.

Defendant indicates that SCJ collected on its judgment by successfully intervening in his divorce action in Madison County, Illinois, taking most of defendant's assets, including his company (worth about $12 million) and all of the real estate he owned (worth about $82 million). He indicates that SCJ left him with a car, his 401(k), and personal and household items not to exceed $50,000.

## C.    Relevant Proceedings in this Case

Defendant raised his improper coordination argument in a motion to compel discovery he previously filed in this case. (R. 62.) In that motion, defendant argued that because the government and SCJ coordinated their efforts in the criminal investigation and civil litigation, SCJ and its lawyers should be considered part of the government's team for purposes of the government's discovery obligations in this case. He further argued that the government should be required to produce all communications between SCJ and any government agent or prosecutor involved in the investigation and prosecution of this case. I held a hearing on July 12, 2011, then denied the motion in part. (R. 69.)

As a general matter, I found nothing improper about SCJ assisting the government in its investigation. "Alleged victims of crime regularly cooperate with the government's prosecution of the individuals who allegedly victimized them." (R. 69 at 12.) However, I indicated that I would be willing to revisit the issue if defendant filed a motion to dismiss

alleging improper pre-charging delay or other defect in the initiation of the proceedings based on the SCJ/government cooperation. (Id.) I noted that any communications from SCJ personnel falling under the Jencks Act or otherwise discoverable under Rule 16 had to be produced, but I saw no need to require production of every single communication between SCJ and the government for the past several years. (Id. at 12-13.) I likewise rejected defendant's argument that the government should be required to seek out certain discovery materials from SCJ, noting that the government is only required to produce in discovery materials in its "possession, custody, or control." (Id. at 13-14, quoting Fed. R. Crim. P. 16(a)(1)(E).) "Generally, a defendant seeking exculpatory evidence from third parties must do so via subpoena under Rule 17(c), rather than a demand of the government." (Id. at 14.) I authorized defendant to issue such subpoenas and set a return date of September 30, 2011.

The government and SCJ moved to quash the subpoenas (R. 71, 73), and I held a hearing on the motions on February 13, 2012 (R. 87). At that hearing, the parties indicated that some of the subpoenaed material had been produced in discovery in the civil case, and they agreed to obtain modification of the protective order in the civil case so that defense counsel could complete his review of those materials and update the court before I ruled on the motions to quash. I agreed to their proposal, setting the matter for status on April 13, 2012. I also set a deadline for defendant to file a motion to dismiss. On the agreement of the parties, I later extended the motion deadline and adjourned the status to June 1, 2012. (R. 88.) On May 30, 2012, on defendant's unopposed request, I adjourned the June 1, 2012 status, directing the parties to advise the court if and when they would like to reset a hearing to address the outstanding subpoenas and motions to quash. I further indicated that I would issue a written decision on the pending motion to dismiss. This is that decision.

## II.  DISCUSSION

**A.     Double Jeopardy Claim**

The Double Jeopardy Clause protects against a second prosecution for the same offense after an acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense imposed in a single proceeding.  E.g., McCloud v. Deppisch, 409 F.3d 869, 873 (7th Cir. 2005) (citing Jones v. Thomas, 491 U.S. 376, 381 (1989)).  In the successive action context, the Supreme Court has clarified that the Clause does not prohibit the imposition of all additional sanctions that could, in common parlance, be described as punishment; rather, the Clause "protects only against the imposition of multiple criminal punishments for the same offense."  Hudson v. United States, 522 U.S. 93, 99 (1997).

To determine whether a particular punishment is criminal or civil, the court first asks whether the legislature in establishing the penalizing mechanism indicated either expressly or impliedly a preference for one label or the other.  Id.  If the legislature indicated an intention to establish a civil penalty, the court will inquire further whether the statutory scheme is so punitive either in purpose or effect as to transform what was intended as a civil remedy into a criminal penalty.  Id.  In making this determination, the court considers the factors listed in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-169 (1963), including: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment – retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears

7

excessive in relation to the alternative purpose assigned.  Only the clearest proof  will suffice

to override legislative intent and transform what has been denominated a civil remedy into a

criminal penalty.  Hudson, 522 U.S. at 100.

Defendant argues that SCJ's civil suit under WOCCA resulted in the imposition of a

nominally civil penalty so punitive in effect as to make it a criminal punishment, precluding the

instant federal prosecution based on the same conduct.  Defendant notes WOCCA's location

in the Wisconsin criminal code and the legislative intent that WOCCA penalize and deter

criminal conduct.  He further notes that the basis for civil and criminal liability under WOCCA

is the same.  Defendant relies primarily on Dye v. Frank, 355 F.3d 1102 (7th Cir. 2004), in

which the court held that an administrative drug tax constituted a criminal penalty for double

jeopardy purposes.  The Dye court found the high tax rate imposed by the statute indicative of

criminal punishment rather than revenue-raising or some other non-punitive goal.  Id. at 1104.

Defendant contends that because WOCCA contains a double damages provision (as well as

a punitive damages provision), and the $200 million judgment entered against him far

exceeded SCJ's actual losses (estimated at $15 million in the indictment), that judgment should

also be deemed punishment.  He indicates that the Wisconsin court of appeals found that all

of the damages awarded against him were encompassed in the WOCCA claim, and that one

of the purposes of the award was to punish him.  See 322 Wis. 2d at 788-90.

Even if I were to accept defendant's contentions regarding the purpose and effect of a

WOCCA civil judgment,[3] his claim would fail, as he provides no authority for applying the

---

[3]The Wisconsin court of appeals noted in defendant's civil case that "WOCCA, like its federal counterpart the Racketeer Influenced and Corrupt Organizations Act (RICO), has both penal and remedial purposes; its intent is both to sanction and to compensate."  322 Wis. 2d at 788.  The court strictly construed the provisions establishing penalties, giving the remainder

8

Double Jeopardy Clause to successive actions by the government and a private party. The

Supreme Court has explained that:

> nothing . . . precludes a private party from filing a civil suit seeking damages for conduct that previously was the subject of criminal prosecution and punishment. The protections of the Double Jeopardy Clause are not triggered by litigation between private parties. In other words, the only proscription established by our ruling is that the Government may not criminally prosecute a defendant, impose a criminal penalty upon him, and then bring a separate civil action based on the same conduct and receive a judgment that is not rationally related to the goal of making the Government whole.

United States v. Halper, 490 U.S. 435, 451 (1989) (footnote omitted), abrogated on other

grounds by Hudson, 522 U.S. at 96. The lower courts have followed Halper's admonition.[4]

For example, in United States v. Randy, 81 F.3d 65, 66 (7th Cir. 1996), a defendant

charged with mail fraud and RICO violations argued that the involuntary bankruptcy into which

his creditors/victims forced him (and pursuant to which he claimed to have lost all of his assets)

constituted a prior jeopardy requiring the dismissal of the criminal case. The Seventh Circuit

disagreed, noting that the bankruptcy was brought by private creditors, not the government.

Id. at 69.

---

of the act a liberal construction. Id. The court further noted that the "multiple damages provision in WOCCA is very similar to its federal counterpart in RICO, which the United States Supreme Court has repeatedly acknowledged is remedial[.]" Id. at 789 (footnote omitted) (citing PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 406 (2003) (acknowledging that the multiple damages provision contained in RICO is remedial in nature)). The court went on to find that the damages at issue all fell under WOCCA and were thus properly doubled. Given the court's suggestion that the damages provision at issue was remedial, I do not read the decision as providing support for defendant's contention that the judgment qualifies as a punitive sanction. In any event, as discussed in the text to follow, private actions do not implicate the Double Jeopardy Clause.

[4]Defendant in his reply criticizes the government for relying only on Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 275 n.21 (1989) (citing Halper, 490 U.S. at 451). However, as discussed in the following text, lower courts have followed Halper on this issue, in both civil and criminal cases.

In United States v. Beszborn, 21 F.3d 62, 64-65 (5th Cir. 1994), a defendant charged

with defrauding a federally insured savings and loan association argued that a previous civil

RICO suit brought against him by the Resolution Trust Corporation ("RTC") precluded the

criminal prosecution. The Fifth Circuit disagreed, noting that in "order for the Double Jeopardy

Clause to have any application, there must be actions by a sovereign, which place an individual

twice in jeopardy. The Double Jeopardy Clause does not apply to actions involving private

individuals." Id. at 67-68. The court noted that although Congress created the RTC to handle

the affairs of failed financial institutions, in this instance the RTC acted as a receiver rather than

in a regulatory capacity, with the proceeds of the civil action benefitting the creditors and

stockholders of the failed institution rather than the United States treasury. Id. at 68.

> In its capacity as receiver, the RTC stands as a private, non-governmental entity, and is not the Government for purpose of the Double Jeopardy Clause.
>
> Accordingly, because the RTC assumed the litigation . . . in its private, non-governmental capacity as receiver, the suit was purely an action between private individuals. Therefore, because no damage award was pursued or imposed by the Government, the Double Jeopardy Clause has not been implicated or violated.

Id.

In Individual Known to the Defendant as 08mist096.jpg v. Falso, No. 5:08-cv-917, 2009

WL 4807537, at *1 (N.D.N.Y. Dec. 9, 2009), the defendant, convicted of child pornography

offenses and sentenced to 30 years in prison, sought dismissal on double jeopardy grounds

of a civil suit brought against him by one of the victim-children depicted in the images he

possessed. Citing Halper, the court rejected his argument, noting that while the government

prosecuted the defendant (resulting in a criminal penalty) and enacted the statute authorizing

recovery of damages in child pornography cases (with a mandatory minimum amount of

10

damages), it had not brought the civil action.  Id. at *3.

In United States v. Ginn, No. CRIM.A. 304CR28201H, 2005 WL 2493342, at *1-2 (N.D. Tex. Oct. 7, 2005), the defendant, a plan agent in a chapter 11 bankruptcy proceeding, breached his fiduciary duty resulting in an order from the bankruptcy court that he be removed and disgorge his fees.  Following his indictment on bankruptcy fraud and other charges, the defendant moved to dismiss, asserting that the disgorgement ordered by the bankruptcy court constituted a previously imposed punishment under the Double Jeopardy Clause.  Id. at *2. The court disagreed, noting that a bankruptcy proceeding between private parties led to the disgorgement and forfeiture.  Id. at *3.  While the United States trustee played a role in the bankruptcy proceeding, the court found that insufficient to trigger the Double Jeopardy Clause. Id.  The defendant urged the court to consider the nature of the alleged penalty imposed in the bankruptcy proceeding, but the court found that unnecessary as it was imposed in proceedings between private parties, and the defendant cited no cases in which a court extended double jeopardy protection in a criminal proceeding on the basis of a civil proceeding not initiated by the government.  Id. at *4 (citing Hansen v. Johns-Manville Prods. Corp., 734 F.2d 1036, 1042 (5th Cir.1984)).

In Goyal v. United States, 103 F. Supp. 2d 802, 805 (D.N.J. 2000), the court found that the mail fraud prosecution of a defendant who allegedly defrauded a creditor did not violate double jeopardy, even though the underlying obligation was also declared non-dischargeable in the defendant's private bankruptcy proceeding.  Under these circumstances, the court concluded, "the Double Jeopardy Clause simply is not implicated.  A private, civil bankruptcy proceeding and criminal prosecution do not constitute a violation of the Double Jeopardy Clause because the bankruptcy litigation was not criminal, nor did it involve the government."

11

Id.; see also United States v. Dellorfano, CRIM. A. Nos. 92-27-1, 93-315, 1996 WL 153527, at *6 (E.D. Pa. Apr. 2, 1996) ("None of these cases cited by Dellorfano, and none that the court finds, suggests that a private civil action, which involves the same conduct as that in a proceeding initiated by the government, raises any double jeopardy concerns."); Stewart v. Roe, 776 F. Supp. 1304, 1308 (N.D. Ill.1991) (rejecting the argument that a prior criminal punishment precluded punitive damages in a later civil action based on the same conduct).

Given the absence of any authority for applying the Double Jeopardy Clause under these circumstances, defendant's motion to dismiss on double jeopardy grounds must be denied.

**B.      Kordel Claim**

In Kordel, the defendants, officers of a food company, were convicted of violations of the Federal Food, Drug, and Cosmetic Act.  They argued on appeal that their convictions should be reversed based on the government's use of interrogatories to obtain evidence from them in a contemporaneous civil condemnation proceeding brought by the FDA.  397 U.S. at 2-3.  The Court first rejected the defendants' Fifth Amendment argument, noting that neither invoked the privilege against compulsory self-incrimination in the civil proceeding.  Id. at 7-10.  The Court also rejected the defendants' argument that the parallel civil and criminal proceedings "reflected such unfairness and want of consideration for justice as independently to require the reversal of their convictions [as] a violation of due process or a departure from proper standards in the administration of justice."  Id. at 11.  The Court noted:

> We do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other

special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution.

Id. at 11-12 (footnotes omitted).  The Court found that overturning the convictions would be tantamount to saying that the government's use of interrogatories directed against a corporate defendant in the ordinary course of a civil proceeding would always immunize the corporation's officers from subsequent criminal prosecution.  Id. at 12-13.

In the present case, defendant argues that the coordinated civil and criminal actions departed from the proper administration of criminal justice.  This coordination, he contends, deprived him of his ability to present a meaningful defense at his civil trial; allowed SCJ to obtain an enormous civil verdict against him that was, in effect, a criminal punishment; permitted SCJ to execute on the judgment and take most of his assets, including his company; and delayed indictment and criminal discovery until he no longer had the ability to seek a new trial based on information provided in the criminal discovery.  He was then indicted on fourteen criminal offenses based on conduct for which he was already tried civilly.[5]

Even accepting that the government and SCJ coordinated in certain respects, and that the timing of the two actions has worked to defendant's detriment, the motion fails.  As with his first claim, defendant cites no case supporting dismissal based on coordinated proceedings brought by the government and a private party.  As indicated, Kordel involved dual actions by the government, as did United States v. Unruh, 855 F.2d 1363, 1374 (9th Cir. 1987), the only other case defendant cites.  I have found no decision dismissing an indictment pursuant to the Kordel dicta based on parallel civil and criminal actions brought by a private party and the

_____

[5]Defendant indicated that he intended to supplement or renew the Kordel claim should he obtain additional relevant evidence pursuant to his review of the civil discovery and/or the Rule 17(c) subpoenas.  To date, nothing further has been submitted.

13

government.  See generally United States v. Ohle, 678 F. Supp. 2d 215, 234 (S.D.N.Y. 2010) (denying motion to dismiss under Kordel based on civil tax proceedings by the IRS); United States v. Asiegbu, No. CR 02-00673, 2009 WL 413132, at *7-8 (C.D. Cal. Feb. 17, 2009) (collecting cases involving Kordel claims); United States v. Mahaffy, 446 F. Supp. 2d 115, 123-24 (E.D.N.Y. 2006) (discussing the sparse precedent on Kordel claims).  Cf. Sterling Nat. Bank v. A-1 Hotels Intern., Inc., 175 F. Supp. 2d 573, 578-79 (S.D.N.Y. 2001) (denying motion to stay a civil RICO case because of a pending federal criminal investigation).

To the extent that Kordel could possibly be extended to this type of situation, defendant's allegations fall short.  The Seventh Circuit has never taken the "extreme step of dismissing criminal charges against a defendant because of government misconduct," United States v. Childs, 447 F.3d 541, 545 (7th Cir. 2006) (citing United States v. Boyd, 55 F.3d 239 (7th Cir. 1995); United States v. Miller, 891 F.2d 1265 (7th Cir. 1989)), and defendant's claims do not warrant such action here.

Defendant does not allege that the government used the civil case as a stalking horse for its criminal investigation, or that it otherwise employed private parties to obtain evidence it lawfully could not.[6]  Defendant had counsel in the civil case, was aware of the pending grand jury investigation, and exercised his Fifth Amendment privilege accordingly.  Nor does defendant allege that the government violated grand jury secrecy rules by sharing information

---

[6]As discussed above, defendant claims that an imposter tried to obtain his banking information, but he makes no allegation that the government instigated or condoned this conduct.  Nor does he allege that the government benefitted from the calls.  Indeed, as he indicates, the government was able to use the grand jury to obtain relevant banking information.  To the extent that he may be alleging that someone acting at SCJ's behest made these calls, he provides no basis for attributing such misconduct to the government.  As the government indicates, SCJ could have legitimately learned where defendant banked by looking at canceled checks; it did not need any help from the government in this regard.

from its investigation with SCJ; as I indicated in my previous order on the discovery motion, I see nothing nefarious with SCJ, the alleged victim of a crime, sharing information with the government. The government acknowledges that it coordinated the execution of the search warrant at Morris's office with SCJ's filing of the civil suit against Morris, but that was done so as not to tip Morris off to the discovery of his alleged fraud, a valid purpose. Further, defendant fails to explain how this search, conducted on SCJ's premises, harmed him.

Defendant complains of the delay in indicting him, but he makes no argument that the delay has prejudiced his ability to defend himself in this case . See Prewitt v. United States, 83 F.3d 812, 820 (7th Cir. 1996) (noting that a defendant must show actual and substantial prejudice to prevail on a claim of pre-indictment delay). Instead, he contends that had he been indicted and provided discovery sooner he may have been able to win a new civil trial. But he cites no case holding that prejudice in an earlier civil case warrants the strong remedy of dismissal of a subsequent criminal indictment validly obtained.[7]

Finally, defendant complains about SCJ's efforts to collect on the judgment. However, the government was not part of those efforts. Indeed, the government has been supportive of defendant's efforts to access funds for his defense in this case (R. 24, 29, 84) and has dismissed the forfeiture allegations in the indictment (R. 45).[8]

---

[7]The government vehemently denies delaying the indictment in order to prejudice defendant in the civil case.

[8]Defendant indicates in his reply brief that he had to file various motions to obtain funds to effectuate his right to counsel of choice. He further notes that while the government did not oppose his motions, SCJ did. But SCJ ultimately withdrew its objection, and an agreement was reached to allow him to have the funds needed to retain counsel. Whatever actions SCJ may have taken, it is undisputed that the government never sought to interfere with defendant's right to counsel. Finally, as I indicated in ruling on the discovery motion, I can consider arguments pertaining to excessive forfeitures based on the effects of the civil litigation if defendant is

**C.    Request for Evidentiary Hearing**

"District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." United States v. Curlin, 638 F.3d 562, 564 (7th Cir. 2011). "The defendant bears the burden of both identifying a definite disputed factual issue, and demonstrating its materiality." Id.

Even if the facts are as defendant alleges, given the absence of legal authority for his motion, there is no need for an evidentiary hearing. I accordingly deny his request.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion (R. 90) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 26th day of July, 2012.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

convicted and must be sentenced in this case.